******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* CARLTON HENDERSON
## (SC 20990)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder and risk of injury to a child in connection with the stabbing death of the victim, the defendant's former girlfriend, in the presence of the victim's twelve year old son, the defendant appealed to this court. Prior to the murder, the victim had been attempting to end her long-term relationship with the defendant allegedly because of the defendant's drug and alcohol abuse and his refusal or inability to contribute financially. She also had been attempting to force him to leave the home that they had been sharing. The defendant claimed that he was entitled to a new trial because the trial court improperly had denied his request for a jury instruction on the affirmative defense of extreme emotional disturbance. *Held*:

The trial court properly declined to instruct the jury on the affirmative defense of extreme emotional disturbance, as that court correctly concluded that a rational juror could not find by a preponderance of the evidence that the defendant was suffering from an extreme emotional disturbance at the time of the murder.

Although the evidence suggested that the defendant was exposed to an extremely unusual and overwhelming state that did not constitute mere annoyance or unhappiness, the evidence, even when viewed in the light most favorable to the defendant, did not demonstrate that the defendant lost self-control or that his ability to reason was overborne by extreme, intense feelings at the time of the murder, especially in view of his actions prior to the murder, his efforts to evade the police after the murder, and certain other conduct demonstrating consciousness of guilt and self-control.

(*One justice dissenting*)

Argued March 7—officially released September 23, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder and risk of injury to a child, brought to the Superior Court in the judicial district of New London and tried to the jury before *S. Murphy, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Sarah E. Steere*, senior assistant state's attorney, and, on the brief, *Paul J. Narducci*, state's attorney, and *Christa L. Baker*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALEXANDER, J. Nearly thirty years ago, then Justice Robert J. Callahan anticipated the need for a particularized evidentiary showing of extreme emotional disturbance in intimate partner homicide cases in order not to establish "a per se rule that anyone who kills a former girlfriend or boyfriend is entitled to a jury instruction on extreme emotional disturbance." *State* v. *Person*, 236 Conn. 342, 361–62 and n.1, 673 A.2d 463 (1996) (*Callahan, J.*, dissenting). Justice Callahan's observation is instructive as we consider the appeal of the defendant, Carlton Henderson, who was convicted, after a jury trial, of the murder of his long-term girlfriend (victim)[1] in violation of General Statutes § 53a-54a and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). On appeal, the defendant claims that the trial court's denial of the defendant's request to instruct the jury on the affirmative defense of extreme emotional disturbance under § 53a-54a (a) entitles him to a new trial. We disagree and affirm the judgment of conviction.

The jury reasonably could have found the following facts. In November, 2019, the defendant and the victim lived together in Stonington with the victim's twelve year old son, J. The victim worked as a bank manager and, throughout her ten year relationship with the

---

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

defendant, acted as the sole financial provider for the family. The defendant's addictions to phencyclidine (PCP) and alcohol, and his failure to maintain employment, were major sources of tension in the relationship.

On November 22, 2019, the defendant abruptly left his job at a Walmart store in Waterford, which he had held for about two months, leading to an argument with the victim. The victim pleaded with the defendant to continue working, but he accused her of "ratting" him out and causing him to lose his job. The victim denied the accusation and replied that the defendant was "looking for an excuse to quit." The victim expressed her frustration with the defendant, telling him via text message: "I'm done busting my ass to keep a roof over our heads and bills paid while you do NOTHING to help. I'd rather be by myself. . . . I asked you to do [two] things, don't smoke [PCP] and keep working because I need the help. Your quitting is a slap in the face." The victim then ended their relationship and asked the defendant to move out of their apartment, but he refused to do so.

Shortly thereafter, while J traveled to Pennsylvania with his father's family for Thanksgiving, the victim left the apartment to stay with her mother, who lived nearby. The victim informed her mother that she no longer felt safe with the defendant in the home. On November 23, 2019, the victim and her mother called the Stonington Police Department seeking help removing the defendant from the home. The dispatcher informed them that the police could not force him to leave but that, if any further "problem" were to occur, they should call again. Without help from law enforcement, the victim and her mother decided to change the locks in the apartment while the defendant was out; that proved impossible, however, because the defendant either remained in the apartment or parked his vehicle in front of the victim's mother's house, waiting

for the victim to return from work. The defendant warned the victim that, if she did not come home, "things were going to be bad . . . ."

On November 25, 2019, the defendant texted a friend concerning the victim: "These bitches are nasty . . . . After [ten] plus years, thanks." The friend responded: "Yeah, bro. Keep your head up. Karma is a bitch. And it is definitely real. She will get what she did to you in the next chapter." The defendant replied: "Word, bro. Next chapter. You already know karma is a bitch." The friend texted: "There is no doubt about it. If she kept it real, it would have been a positive karma. But being that it must have been some bullshit she pulled. The same or worse of the bad will fall her way. You just do you and don't let it break you. Hold tight and hold strong." The defendant replied: "I'm holding on strong, but if anything was ever to happen to me, hold it down, my boy, for real." The friend responded: "If shit getting that thick, hold off until the weekend. You can come get me, and we can solve whatever problem you're having with whoever . . . ."

On Friday, November 29, 2019, the day after Thanksgiving, J returned from Pennsylvania. The victim informed her mother that she would return home with J and seek the landlord's help in removing the defendant from the apartment because she "didn't think that [the defendant] would do anything with [J] there." The victim and J returned to the apartment between 7 and 8 p.m. The defendant spent the night smoking PCP and drinking in the sunroom.

The next morning, Saturday, November 30, J woke up at around 8 a.m. and started to watch cartoons on his cell phone. The victim entered his bedroom and asked if he wanted to go to a McDonald's restaurant. J replied affirmatively, and the victim went to get her coat, which was in the hallway right outside of J's bed-

room door. While the victim was putting on her coat, J saw the defendant "[come] up from behind her," "[grab] her by the neck," and put "her in . . . a choke hold." Frozen in fear on his bed, J watched as the victim tried to calm the defendant, asking him to "talk this out," and telling him that "[he didn't] have to do this." The struggle then moved from the hallway into J's bedroom. J tried to call for help on his phone, but the defendant took the phone from him. At that point, it appeared to J that the victim had calmed the defendant, as he released her "for a minute or two" and was "listening to what she ha[d] to say." The struggle resumed, however, and the defendant again placed the victim in a choke hold. The defendant pulled out a knife from his pocket and stabbed the victim in the neck; J saw blood dripping to the floor. The defendant released the victim, who then stumbled into the hallway and toward the front door. J followed and saw the defendant grab the victim by her hair, pull her back inside to prevent her from escaping through the front door, and tell her, "it's over, it's over," as the victim continued pleading with him to talk instead. J broke past them, running to a nearby house where he asked a neighbor to call the police.

At approximately 8:14 a.m., police officers were dispatched to the victim's home. As the officers arrived on the scene, another neighbor saw the defendant rush out of the back door of the home, enter his Nissan Maxima, and speed down the driveway, even though a police cruiser partially blocked the exit. The defendant drove directly toward a police officer, who was forced to jump out of the driveway to avoid being struck. The defendant maneuvered the vehicle through the gap between the parked cruiser and a fence, ignored police commands to stop, and sped away from the scene.

The victim, meanwhile, was lying on the front steps of the home, her face covered in blood and her head

resting on the lower step. Paramedics transported the victim to Westerly Hospital, and she was subsequently airlifted to Yale New Haven Hospital, where she was declared "brain dead." Life support measures were discontinued on December 6, 2019.[2]

After fleeing the crime scene, the defendant drove to a Dunkin' Donuts in North Stonington, where he was a regular customer. The defendant discarded J's phone on his route from the scene to Dunkin' Donuts; although it later "pinged" in North Stonington, it was never recovered. At around 8:40 a.m., the defendant placed a phone call to his mother, Cynthia Ellis, who gave him the phone number of a sister who lived in Brooklyn, New York. He called his other sister at 9:18 a.m. At 9:44 a.m., the defendant's daughter texted him to ask him to pick her up a coffee, to which he replied: "Yes, ten minutes."

The police obtained a search warrant for the defendant's cell phone location data. On the basis of this data, detectives learned that, on the morning of the stabbing, the defendant traveled from the crime scene to North Stonington, then to New London, and, ultimately, to New York City, where license plate readers recorded his Nissan Maxima crossing the Throgs Neck Bridge into Queens around noon, and then again in the opposite direction at around 3:30 p.m. Detectives later determined that the defendant went to see his sister, with whom he did not have a close relationship, to convince her to "hold" his car for him so that he could sell it. The cell phone location data last showed the defendant at an Interstate 95 truck stop in Fairfield County at approximately 5 p.m. on November 30, 2019,

---

[2] An autopsy performed the following day determined that the victim's cause of death was complications from sharp force injuries to the neck. The victim had four stab wounds in the back of her neck. One stab wound cut through her spinal cord, which paralyzed the victim and deprived her of the ability to breathe on her own.

when detectives believed the defendant switched the phone off.

That evening, the defendant also called his uncle, Willis T. Boykin, Jr. From Boykin, he learned that the victim was "fighting for her life" and that the police had surrounded the hotel where Boykin was living, looking for the defendant. The defendant spent a few days in Hartford, before reaching out, on December 4, 2019, to a high school friend, Ryann Pridham, who lived in Norwich. He asked her "what the word on the street was" about him. Pridham informed him that she had read in a newspaper that the victim was alive. Pridham testified that the defendant's demeanor was calm but sad and that they avoided discussing the victim. The defendant stayed the night at Pridham's apartment. The next morning, Pridham gave the defendant money for gas and food, and they both left the apartment and went their separate ways.

After the defendant left, Pridham contacted the police to inform them that the defendant had stayed at her apartment and that she expected him to return. Officers surveilled the apartment beginning on December 5, 2019, and apprehended the defendant after a short pursuit on foot. When he was arrested, the defendant still had traces of the victim's blood on his shoes, baseball hat, and cell phone.

The state charged the defendant with murder and risk of injury to a child. The defendant pleaded not guilty and elected a jury trial. In addition to the original charges, the court instructed the jury on the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1), and on intoxication pursuant to General Statutes § 53a-7. The trial court, however, denied the defendant's request for a jury instruction on the affirmative defense of extreme emotional disturbance pursuant to § 53a-54a (a). The

jury returned a verdict of guilty of murder and risk of injury to a child, and the trial court rendered judgment in accordance with the jury's verdict. The trial court sentenced the defendant to a total effective term of seventy years of imprisonment. This direct appeal followed. See General Statutes § 51-199 (b) (3).

On appeal, the defendant claims that the trial court improperly denied his request for a jury instruction on the affirmative defense of extreme emotional disturbance. We disagree.

The following additional facts and procedural history are relevant to the defendant's claim. At trial, the defendant testified in his own defense and introduced the testimony of Boykin. Boykin testified about the defendant's longtime use of alcohol and PCP, which had been increasing in 2019. The defendant testified that he had used drugs throughout his adult life and that PCP was his drug of choice. He testified that his drug use and inability to keep a job frequently resulted in "trouble" between him and the victim. The defendant testified that he and the victim argued because he wanted to quit his job at Walmart. He stated: "I didn't want to be there. I felt broken . . . . I just didn't have the things that I wanted. I wanted to get high. I wanted to run around and hang out." The defendant further suspected that the victim was "trying to be with somebody else," although he admitted he had no proof. When the victim left their home to stay with her mother, he was "scared of losing her" and J, and tried to persuade her to return.

The defendant testified that, on the evening of November 29, 2019, the victim and J returned home. The defendant spent the night drinking and smoking PCP, and he did not recall going to sleep. The next morning, he asked the victim if she would drive him to a McDonald's restaurant. She told him to drive himself. He then saw her put her jacket on and thought that she

might have changed her mind. The defendant began preparing to join her when he saw her walking toward him with a knife in her hand, saying, "today you're going to get the . . . F out of here. One way or another you're getting out of here." The defendant claimed that he lunged for the knife, precipitating a struggle that spilled into J's bedroom. After that, "it was like a blur," and he remembered "nothing . . . but leaving."

The defendant testified that, when he saw the victim with a knife, he was "shocked" and "surprised," and felt "angry." When J was present, the defendant and the victim, by agreement, "never argued." Neither the defendant nor the victim had ever used a weapon against the other, and he testified that he "never [thought] she would do anything like that." Although the defendant testified that he "blanked out" and had no memory of stabbing the victim, he did remember grabbing his bag, leaving through the back door, and getting into his car. He did not recall nearly striking a police officer in the driveway or squeezing by the police cruiser near the fence, but testified: "When I remember leaving, I seen [the officer] on the way, and I left."

The defendant testified that he recalled stopping at Dunkin' Donuts because he needed "somewhere to think." He remembered calling Ellis and informing her that he and the victim had been arguing and that a knife was involved. When Ellis asked if the victim was all right, the defendant said: "I think so. I think she's straight." Ellis urged the defendant to turn himself in to the police, but he replied that he could not because he had no money. He recalled obtaining his sister's phone number and asking her to "hold" onto his car so he could "eventually sell it." The defendant contacted three or four other family members, including Boykin, "[t]o find out what was going on." When Boykin told him that the victim was "fighting for her life" and that the police were looking for him, the defendant

responded, "don't tell me that," and hung up. The defendant testified that he was "really scared" and "just . . . hoping that [the victim] was okay." For several days, he drove around "aimlessly," eventually driving to New York City and then returning to Hartford that same day. When the police finally caught up with him outside of Pridham's apartment in Norwich, the defendant attempted to flee because he knew that he was wanted for stabbing the victim.

The defendant filed a written request to charge the jury on the affirmative defense of extreme emotional disturbance. After hearing arguments from the parties, the trial court denied the request, concluding that there was "no evidence, including circumstantial, that would be sufficient to demonstrate that the defendant was under the influence of an extreme emotional disturbance and not something other than mere annoyance or unhappiness with the situation." Defense counsel took exception to the court's denial of his request.

Section 53a-54a (a), in defining the crime of murder, provides an affirmative defense for "a homicide committed by a defendant who acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . . Under such circumstances, if a defendant intentionally causes the death of an individual, but does so under extreme emotional disturbance, the trier of fact may convict the defendant of manslaughter in the first degree in violation of . . . § 53a-55 (a) (2)." (Internal quotation marks omitted.) *State* v. *Person*, supra, 236 Conn. 345. The defendant must establish two elements to prove the affirmative defense of extreme emotional disturbance, namely, that (1) he "committed the offense under the influence of extreme emotional disturbance,"

and (2) "there was a reasonable explanation or excuse for [his] extreme emotional disturbance." *State* v. *Forrest*, 216 Conn. 139, 148, 578 A.2d 1066 (1990); see also *State* v. *Person*, supra, 351.

The first element of the defense is subjective; it requires inquiry into the defendant's unique situation and belief to determine whether he did, in fact, experience an extreme emotional disturbance to ensure "that the claimed explanation as to the cause of his action is not contrived or sham."[3] *People* v. *Casassa*, 49 N.Y.2d 668, 678–79, 404 N.E.2d 1310, 427 N.Y.S.2d 769, cert. denied, 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 50 (1980). Applying the subjective element requires "an understanding of the situation as it would have been perceived, not by a perfectly sensible individual but by the particular defendant at bar . . . ." (Citation omitted.) *People* v. *Liebman*, 179 App. Div. 2d 245, 255–56, 583 N.Y.S.2d 234 (1992), appeal dismissed, 81 N.Y.2d 834, 611 N.E.2d 296, 595 N.Y.S.2d 395 (1993).

The second element of the defense, however, is primarily objective;[4] the fact finder evaluates the reason-

[3] "Because . . . § 53a-54a (a) is almost a literal copy of New York Penal Law §125.25 (1) (a), we find it appropriate to resort to the decisions of New York courts construing the common statutory language." *State* v. *Ortiz*, 217 Conn. 648, 654–55 n.6, 588 A.2d 127 (1991); see *State* v. *Elliott*, 177 Conn. 1, 5, 411 A.2d 3 (1979) ("[t]he fact that a statute is almost a literal copy of a statute of a sister state is persuasive evidence of a practical reenactment of the statute of the sister state; as such it is proper to resort to the decisions of a sister court construing that statutory language").

[4] A leading New York case on this point has explained: "Clearly the test of the reasonableness of the cause cannot be completely objective, for the model on which we fashion many of our legal standards, the reasonable man, quite plainly does not kill. . . . The subjective aspect of the test is therefore injected to offer room for argument as to the reasonableness of the explanations or excuses offered. . . .

"The question in the end will be whether the actor's loss of self-control can be understood in terms that arouse sympathy enough to call for mitigation in the sentence." (Citations omitted; internal quotation marks omitted.) *People* v. *Shelton*, 88 Misc. 2d 136, 143, 385 N.Y.S.2d 708 (1976), aff'd, 78 App. Div. 2d 821, 434 N.Y.S.2d 649 (1980); see also *State* v. *Elliott*, 177 Conn. 1, 9, 411 A.2d 3 (1979) (deeming *Shelton* to be persuasive and "exhaustive"

ableness of the explanation or excuse for the defendant's extreme emotional disturbance from the perspective of a reasonable person in the defendant's situation, under the circumstances as the defendant believed them to be. *State* v. *Ortiz*, 217 Conn. 648, 657, 588 A.2d 127 (1991); see also *State* v. *Elliott*, 177 Conn. 1, 7, 411 A.2d 3 (1979) (explaining that § 53-54a (a) "sets forth a standard that is objective in its overview, but subjective as to the defendant's belief").

Whether the defendant was entitled to an instruction on the affirmative defense of extreme emotional disturbance is a question of law subject to plenary review, as is the case with other affirmative defenses for which the defendant bears the burden of proof. See, e.g., *State* v. *Person*, supra, 236 Conn. 352 (concluding, with respect to extreme emotional disturbance defense, that, "[i]f there is sufficient evidence of a legal defense, the defendant is entitled, as a matter of law, to a requested jury charge on that defense"). In reviewing a trial court's rejection of a defendant's request for a jury instruction on an affirmative defense, we "adopt the version of the facts most favorable to the defendant [that] the evidence would reasonably support." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 620, 275 A.3d 601 (2022). "[A] defendant is entitled to a requested instruction on the affirmative defense of extreme emotional disturbance only if there is sufficient evidence for a rational juror to find that [the defendant has established both] elements of the defense . . . by a preponderance of the evidence."[5] *State* v. *Person*, supra, 353.

---

examination of affirmative defense of extreme emotional disturbance).

[5] Quoting *United States* v. *Alfonso-Perez*, 535 F.2d 1362, 1365 (2d Cir. 1976), the defendant claims that he "is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible . . . ." (Internal quotation marks omitted.) This claim conflates the "any evidence" standard with the sufficiency standard, which is a heavier burden. Indeed, in *State* v. *Person*, supra, 236 Conn. 342, this court overruled *State* v. *Belle*, 215 Conn. 257, 576

The parties' arguments center on the subjective element of the extreme emotional disturbance defense.[6] The subjective element of the defense requires the fact finder to determine whether the defendant was under the influence of an extreme emotional disturbance when he committed the offense. Id., 351. In *State* v. *Elliott*, supra, 177 Conn. 1, this court identified three "understandable guidelines . . . essential to support the inference that a defendant suffered from extreme emotional disturbance at a particular time." (Citation omitted; internal quotation marks omitted.) *State* v. *Forrest*, supra, 216 Conn. 148. "[First] the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the Penal Code; [second] the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and [third] the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions." *State* v. *Elliott*, supra, 177 Conn. 9. These guidelines, however, "are neither conclusive nor exclusive," and they do not replace the two elements established by the legislature. *State* v. *Forrest*, supra, 148. "Consideration is given to whether the intensity of [the defendant's] feelings was such that his usual intellectual controls failed and [his] normal rational thinking . . . no longer prevailed at the time of the act. . . . [T]he term 'extreme' refers to the greatest degree of intensity

A.2d 139 (1990), and *State* v. *Bryan*, 34 Conn. App. 317, 641 A.2d 443 (1994), to the extent that they held that the presence of " 'any evidence' " is sufficient to entitle a defendant to a requested instruction regarding an affirmative defense. *State* v. *Person*, supra, 352–53.

[6] Neither party's brief addresses the objective element of the extreme emotional disturbance defense, which evaluates the reasonableness of the defendant's reaction. This is consistent with the trial court's oral decision denying the requested instruction on the ground that the defendant had failed to show that he experienced an extreme emotional disturbance.

away from the norm for [the defendant]." *State* v. *Elliott*, supra, 10. An extreme emotional disturbance "does not require a provoking or triggering event; or that the homicidal act occur immediately after the cause or causes of the defendant's extreme emotional disturbance; or that the defendant have lost all ability to reason." Id., 7.

It is undisputed that the defendant satisfies the first *Elliott* guideline, as there is no evidence that he was suffering from a mental disease or defect rising to the level of insanity. See id., 9. There is, however, disagreement as to whether the other two guidelines were met, namely, whether there was sufficient evidence that "the defendant was exposed to an extremely unusual and overwhelming state" and that he experienced an extreme reaction to that state. Id. Reviewing the evidence in the light most favorable to the defendant, there is some evidence to find that, from the defendant's unique point of view, he was exposed to such a state. His claim fails, however, because the evidence overwhelmingly shows that he did not experience the requisite loss of self-control. A rational juror, therefore, could not have found by a preponderance of the evidence that the defendant experienced an extreme emotional disturbance. Accordingly, the trial court properly declined to instruct the jury on the affirmative defense of extreme emotional disturbance.

We begin our analysis with the second *Elliott* guideline, which requires the defendant to show by a preponderance of the evidence that he "was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness . . . ." Id. Viewed in the light most favorable to the defendant, the evidence shows that the victim was attempting to end their ten year relationship because of the defendant's alcohol and drug abuse, and his refusal to contribute financially to the household, and that the defendant faced the immi-

nent loss of his home, family, and financial security. From the perspective of the defendant, who struggled with addiction to both alcohol and PCP, did not want to work, and appeared accustomed to having the victim provide for his basic needs and enable his alcohol and drug use, the prospect of having this relationship end may arguably be understood to present a stressor beyond the mere annoyance or unhappiness that would be experienced in an ordinary romantic breakup. Moreover, we assume the veracity of the defendant's version of the facts in accordance with the standard of review; see, e.g., *State* v. *Hargett*, supra, 343 Conn. 620; which indicates that the victim approached the defendant with a knife to force him out of the apartment.[7] In light of the defendant's testimony that the defendant and the victim never argued when J was present, the introduction of a weapon into the situation by the victim could have elevated the situation to " 'extreme,' " in that it represented "the greatest degree of intensity away from the norm" for the defendant. *State* v. *Elliott*, supra, 177 Conn. 10. Although the end of a romantic relationship, and being asked to move out, is undoubtedly an upsetting event, it is also a common life experience; the victim's introduction of a knife, however, elevates this particular scenario to one that could allow a rational juror to find by a preponderance of the evidence that the defendant was exposed to an "extremely unusual and overwhelming state . . . ." Id., 9.

Next, we turn to the defendant's reaction to the perceived stressor, and we again review the evidence in the light most favorable to the defendant. See, e.g., *State* v. *Hargett*, supra, 343 Conn. 620. The defendant testified that he was "shocked" and "surprised," and felt "angry"

---

[7] Although we assume the veracity of the defendant's version of the facts for purposes of this claim, we note that the defendant did not raise a self-defense claim at trial and that the jury likely credited J's testimony, which directly contradicts the defendant's account of the events.

when the victim threatened him with the knife and that he "went into a blur" and "blanked out" after he disarmed the victim and the struggle moved into J's bedroom. He argues that "mental distress, grief, and fear caused by the imminent loss of a decade-long intimate relationship overbore [his] self-control to the point where he engaged in a violent struggle with [the victim], whom he loved, in front of [J], whom the couple had previously been careful not to even argue in front of . . . ." He further contends that, when he engaged in everyday activities after the murder, like going to Dunkin' Donuts, he was "repressing what had happened . . . while in denial" and that his calls to family members demonstrate that he genuinely did not know what he had done to the victim and that he was concerned for her and J's well-being. We disagree that these facts would allow a rational juror to find by a preponderance of the evidence that the defendant lost self-control or that his ability to reason was overborne by extreme, intense feelings. See, e.g., *State* v. *Elliott*, supra, 177 Conn. 9.

"In determining whether a [defendant] has acted out of a loss of [self-control], the court will look at [his] conduct before and after the homicide." *Zamora* v. *Phillips*, Docket No. 04-CV-4093 (JFB), 2006 WL 2265079, *6 (E.D.N.Y. August 8, 2006); see, e.g., *People* v. *Dominguez*, 226 App. Div. 2d 391, 391, 640 N.Y.S.2d 583, appeal denied, 89 N.Y.2d 921, 677 N.E.2d 295, 654 N.Y.S.2d 723 (1996); *People* v. *Feris*, 144 App. Div. 2d 691, 692, 535 N.Y.S.2d 17 (1988). The petitioner in *Zamora*, who had shot and killed his former girlfriend, testified that, when he saw her kissing her new boyfriend, "his emotional system . . . fell down," and "he felt cold from head to toes," and that he shot the victim while in "a dreamlike state," without control over his actions. (Internal quotation marks omitted.) *Zamora* v. *Phillips*, supra, *1. After shooting the victim, the

petitioner threw the gun away and drove to a friend's house in another state. Id. Similarly, in *Feris*, the defendant was able "to skillfully drive his car backward and to negotiate a U-turn while in reverse in an effort to flee the [crime] scene . . . ." *People* v. *Feris*, supra, 692. In *Dominguez*, the defendant left the crime scene, consciously decided not to return home, disposed of the murder weapon, and fled the state. *People* v. *Dominguez*, supra, 391. In each of these cases, the court held that such postcrime actions are inconsistent with the loss of self-control associated with an extreme emotional disturbance because each respective defendant acted consciously and deliberately to evade the police. See, e.g., *Zamora* v. *Phillips*, supra, *7.

In the present case, the defendant took J's phone to prevent him from calling for help during the attack and later discarded it on his way to Dunkin' Donuts. Immediately after the stabbing, with the police on the way, the defendant packed a bag and left the victim's home through the back door. He then maneuvered his vehicle out of the driveway, through a narrow gap between a police cruiser and a fence. He unsuccessfully tried to convince his sister to "hold" onto his vehicle for him. The defendant drove to New York City and Hartford instead of returning home. He knew that the police had contacted his family members, so he sought out a friend, Pridham, for shelter and money. When the police confronted the defendant outside of Pridham's apartment, he ran. All of these actions demonstrate "consciousness of guilt, [which] is entirely inconsistent with an extreme emotional disturbance defense . . . ." (Internal quotation marks omitted.) *State* v. *Jusino*, 163 Conn. App. 618, 634, 137 A.3d 65, cert. denied, 321 Conn. 906, 136 A.3d 643 (2016); see also *Shiwlochan* v. *Portuondo*, 345 F. Supp. 2d 242, 269 (E.D.N.Y. 2004) (petitioner's efforts to hide murder weapon and to evade police were "products of a conscious decision

and undermine[d] the [petitioner's] claim that he was acting under the influence of an extreme emotional disturbance"), aff'd, 150 Fed. Appx. 58 (2d Cir. 2005); *State* v. *Patterson*, 229 Conn. 328, 333, 341, 641 A.2d 123 (1994) (evidence that defendant had intentionally concealed weapon prior to shooting and had fled city and hid weapon after shooting defeated claim that "he had killed the victim in a fit of rage or passion, or under the influence of a similarly extreme emotion").

The defendant argues, however, that such evidence is not dispositive because one need not "los[e] all ability to reason" to qualify for an extreme emotional disturbance defense. *State* v. *Elliott*, supra, 177 Conn. 7. He further contends that to deny him an instruction on the defense on the basis of postcrime conduct is inconsistent with *State* v. *O'Brien-Veader*, 318 Conn. 514, 122 A.3d 555 (2015), in which an extreme emotional disturbance defense instruction was given when a defendant hid the victim's body, gathered his belongings, cleaned himself up, hid bloody clothing and the murder weapon, and socialized with friends immediately after killing the victim. See id., 520–21, 522. We disagree. Most significant, *O'Brien-Veader* was a prosecutorial impropriety case that lacks any precedential value in this context because this court was not asked in that case to consider whether the evidence warranted an extreme emotional disturbance defense instruction. Second, postcrime conduct is only one of several considerations that a court weighs when determining whether to give an extreme emotional disturbance defense instruction. Because the jury instruction was not challenged on appeal in *O'Brien-Veader*, we cannot ascertain what significance the postcrime conduct had in relation to other factors the trial court may have considered.

Moreover, in the present case, the only evidence of the defendant's mental state at the time of the murder came from the defendant himself, who testified that he

was "shocked" and "surprised," and felt "angry" that the victim approached him with a knife and that he "blanked out" after disarming her.[8] In evaluating the sufficiency of the evidence for a jury charge, the weight to afford claims of blackout or other versions of memory loss that frequently accompany the assertion of an extreme emotional disturbance defense depends on the evidence of the defendant's mental state at the time the homicide was committed. See, e.g., *People* v. *Wells*, 101 App. Div. 3d 1250, 1252–53, 955 N.Y.S.2d 684 (2012), appeal denied, 20 N.Y.3d 1066, 985 N.E.2d 927, 962 N.Y.S.2d 617 (2013); see also *State* v. *Asherman*, 193 Conn. 695, 728, 732–33, 478 A.2d 227 (1984) (concluding that extreme emotional disturbance defense instruction was warranted on basis of testimony of witnesses regarding defendant's bizarre behavior and appearance after murder, as well as brutal nature of murder itself), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

We find the decision of the New York court in *People* v. *Wells*, supra, 101 App. Div. 3d 1250, instructive. In that case, the defendant "declined to testify regarding

---

[8] Although it is not required, defendants often present testimony of medical and mental health professionals to prove their mental state at the time of the murder. See, e.g., *State* v. *Crespo*, 246 Conn. 665, 678, 718 A.2d 925 (1998) (testimony of forensic psychiatrist and clinical psychologist that defendant was subject to long-term and immediate stress factors at time of murder), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); *State* v. *Patterson*, supra, 229 Conn. 334–35 (testimony of three psychiatrists and clinical psychologist describing defendant's mental deterioration over two year period prior to murder); *State* v. *Blades*, 225 Conn. 609, 625–26, 626 A.2d 273 (1993) (testimony of primary care physician and psychiatrist regarding defendant's history of substance abuse and response to stressors); *State* v. *Casey*, 201 Conn. 174, 177, 513 A.2d 1183 (1986) (testimony of clinical psychologist that defendant's behavior was consistent with someone in "transient, disassociative state" (internal quotation marks omitted)); *State* v. *Elliott*, supra, 177 Conn. 3 (psychiatrist testified to defendant's overwhelming fear of victim and other long-term stressors). The defendant in the present case did not present the testimony of a mental health expert to support his request for an instruction.

the circumstances of the killing itself on direct examina-tion" but stated that, after he killed the victim, he called his uncle while "still in shock," fell asleep, and then "thought it was a dream when [he] woke up . . . ." (Internal quotation marks omitted.) Id., 1253. During cross-examination, when asked whether he wrapped a lamp cord around the victim's neck, the defendant responded: "I blanked out. I don't remember none of that." (Internal quotation marks omitted.) Id. The court held that the defendant had not provided enough evi-dence to allow a jury to find that he had suffered from any kind of extreme emotional disturbance while killing the victim, given his refusal to discuss the murder aside from his "blank[ing] out" and the lack of any other evidence to support his claim of memory loss. Id., 1253–54. Given the sparsity of this testimony, the court in *Wells* considered other evidence showing the defen-dant's intent to kill and determined that, because the defendant admitted to having angry, jealous thoughts about killing the victim *prior* to the murder, that weighed more heavily than the defendant's assertion that he did not remember the attack. Id., 1253 and n.2.

The defendant in the present case provides slightly more detail than did the defendant in *Wells*, using the words "shocked," "surprised," and "angry" to describe his emotional state prior to his claimed blackout. Never-theless, these are ordinary emotions and not the extreme, intense feelings required to establish that his reason had been overborne. See, e.g., *State* v. *Santos*, 41 Conn. App. 361, 368–69, 675 A.2d 930 (defendant's stated anger, when combined with other evidence showing he was in control of his actions, was insufficient to estab-lish that he had acted under the influence of extreme emotional disturbance), cert. denied, 237 Conn. 932, 677 A.2d 1374 (1996). Moreover, given the emphasis in *Wells* on the defendant's angry, jealous thoughts about killing the victim prior to the murder; see *People* v.

*Wells*, supra, 101 App. Div. 3d 1253 and n.2; the defendant's claim of entitlement to an extreme emotional disturbance defense instruction in the present case is heavily undercut by his actions before the crime. He threatened the victim and her mother the week before the murder and expressed a desire to exact revenge against the victim over Thanksgiving weekend in his November 25, 2019 text message conversation with a friend, agreeing that the victim would "get what she did to [him] in the next chapter" because "karma is a bitch" and warning his friend to "hold it down" if "anything [were] ever to happen to [him] . . . ." From the time he quit his job at Walmart, on November 22, 2019, he knew that the victim's patience had run its course, that he could no longer stay in her apartment, and that the relationship was over. On November 27, she texted him: "I just don't want to do this anymore. I'm asking you to please please please leave." All of this evidence undermines the defendant's claim that he was "shocked" and "surprised" upon the victim's attempt to force him to leave.

The defendant, however, also relies on *State* v. *Person*, supra, 236 Conn 353–56, to argue that the content of his testimony should not preclude him from receiving the extreme emotional disturbance defense instruction because circumstantial evidence may be sufficient to establish the elements of the defense. In *Person*, the victim ended her romantic relationship with the defendant, who subsequently harassed her and her new boyfriend, making threatening phone calls to them after he saw the boyfriend entering the victim's apartment building. Id., 354–55. The defendant in *Person* forcibly entered the victim's apartment that same evening to retrieve his belongings, and, when the victim returned home to find him there and attacked him with Mace, the defendant fatally stabbed her. Id., 346, 355. Because the defendant testified that he was not that upset that

the victim had begun dating someone else, the trial court declined to instruct the jury on the defense of extreme emotional disturbance. Id., 346–47. This court held, however, that the trial court should have given the instruction, despite the defendant's testimony about not being that upset, because there was sufficient evidence for an instruction on the defense. Id., 353–54, 356. Beyond the relationship history between the victim and defendant, and the defendant's witnessing the new boyfriend entering the victim's apartment building, this court emphasized the defendant's "out of it," "tired, drained and exhausted" appearance after the murder, and his "emotional" behavior after he turned himself in to the police, which included crying and begging officers to "just lock [him] up," in holding that there was sufficient evidence for a rational juror to find that the defendant had established the defense by a preponderance of the evidence. (Internal quotation marks omitted.) Id., 356.

We disagree with the defendant's reliance on *Person*. The facts of the present case are distinguishable because the defendant's conduct here was more controlled, and there was no postcrime emotional breakdown during which the defendant expressed remorse like that of the defendant in *Person*. In contrast, the defendant in the present case was able to carry out ordinary interactions with family members, such as getting coffee for his daughter and having lengthy phone conversations with his mother, without breaking down, and he avoided the police for nearly one week. These actions are not evidence of shock and denial, as the defendant claims, but, rather, demonstrate calculated attempts to conceal his location and to evade accountability, especially when viewed in combination with the threats he had communicated in the week prior to the murder. Further, to the extent that the majority opinion in *Person* can be read, as Justice Callahan wrote in dissent, to establish

"a per se rule that anyone who kills a former girlfriend or boyfriend is entitled to a jury instruction on extreme emotional disturbance"; id., 362 n.1 (*Callahan, J.*, dissenting); we disavow any such understanding of that holding.[9]

The defendant further claims that, because he did not attempt to conceal his involvement in the crime and was arrested with blood on his shoes, hat, and phone, his conduct is distinguishable from that of the defendants in cases such as *State* v. *Crespo*, 246 Conn. 665, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999), in which post-crime efforts to cover up or to destroy evidence of the crime defeated an extreme emotional disturbance finding. Id., 673, 682; see also *State* v. *Cannon*, 165 Conn. App. 324, 338, 138 A.3d 1139 (defendant who hid victim's body, cleaned crime scene, and lied about victim's whereabouts did not experience extreme emotional disturbance), cert. denied, 321 Conn. 924, 138 A.3d 285 (2016). The defendant in the present case, however, lacked the opportunity to take concealment steps equivalent to those present in *Crespo* or *Cannon* because J witnessed the stabbing and ran to call the police. With only a few minutes to act, the defendant did not have the opportunity to conceal the victim's body or to clean up the crime scene as the defendants in *Crespo* and *Cannon* had. Furthermore, the defendant's representation that he was arrested wearing a "blood-stained" hat and shoes and carrying a "bloodstained" phone is misleading, as it suggests that, after the murder, he was wandering in a state of disbelief or shock. The blood traces on the defendant's black shoes, black

---

[9] We further note that *Person* does not address the objective element of the defense of extreme emotional disturbance and does not discuss whether the explanation for the defendant's extreme emotional disturbance was reasonable. We leave to another day whether this omission affects *Person*'s precedential value with respect to the defense of extreme emotional disturbance.

hat rim, and black phone case were small and faint, and were visible only upon close inspection;[10] their presence was insufficient in light of the defendant's efforts to evade law enforcement, exhibiting consciousness of guilt and self-control, which are inconsistent with extreme emotional disturbance. Because the defendant failed to provide sufficient evidence showing that he had lost self-control, we conclude that the trial court correctly determined that a rational juror could not find by a preponderance of the evidence that the defendant was suffering from an extreme emotional disturbance, and, therefore, the court properly declined to instruct the jury on that affirmative defense.

The judgment is affirmed.

In this opinion MULLINS, C. J., and McDONALD, D'AURIA, DANNEHY and BRIGHT, Js., concurred.

---

[10] We also note that these were the only blood stains that were found upon his arrest. The defendant asserts that there is no evidence that he disposed of any bloody clothing, which shows that he did not attempt to conceal his crime. It does not appear that the clothing that the defendant was wearing at the time of his arrest was examined by the police, and there was no evidence presented at trial establishing whether he had disposed of any bloody clothing. The defendant, however, testified that, after stabbing the victim, he packed a bag that included a change of clothing.